✓ FILED ___ ENTERED
___ LOGGED _____ RECEIVED

2:36 pm, Nov 21 2022
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF A BLUE APPLE IPHONE, MODEL A2172, ASSIGNED IMEI: 355211923333250, CURRENTLY IN THE CUSTODY OF THE FEDERAL BUREAU OF INVESTIGATION IN BALTIMORE, MARYLAND** | Case No.   22-mj-3278-MJM<br><br>**Filed Under Seal** |

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR SEARCH WARRANT

I, Special Agent Sarah M. Griffiths of the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## INTRODUCTION

1. I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. The SUBJECT DEVICE is a blue Apple iPhone, Model: A2172, International Mobile Equipment Identity (IMEI): 355211923333250, currently located at the FBI field office in Baltimore, Maryland. Law enforcement obtained the SUBJECT DEVICE during an investigation into the non-fatal shooting of Wesley FULGHAM.

3.      I submit that there is probable cause to believe that the SUBJECT DEVICE contains evidence of criminal activity, namely, conspiracy to distribute controlled substances (21 U.S.C. § 846).

4.      The statements made in this Affidavit are based on my own personal knowledge and information provided to me by other law enforcement officers; information I received from law enforcement databases, including the National Criminal Information Center ("NCIC"), and Maryland Judiciary Case Search; and my training and experience.

5.      Because I submit this Affidavit for the limited purpose of establishing probable cause for a search warrant, I have not included all facts known to me concerning the entities, individuals, and events described in this Affidavit.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause.  I have not, however, excluded any information known to me that would defeat a determination of probable cause.

## AFFIANT BACKGROUND

6.      I am "an investigative or law enforcement officer" of the United States within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

7.      I have been a Special Agent with the FBI since January 2020.  Since March 2022, I have been assigned to the FBI's Safe Streets Task Force (SSTF) in Baltimore, which investigates violations of federal drug and firearms statutes.  I have received training in interviewing techniques, arrest procedures, search and seizure, search warrant applications, and various other criminal violations.  I have been involved with investigating various unlawful activities, including drug trafficking, firearms offenses, gang activity, and violent crime occurring in the District of Maryland.  I have participated in search and seizure warrants based on criminal activity including drug trafficking, firearms offenses, and racketeering conspiracy.  I have also received specialized

training in investigating crimes involving the sale of illegal narcotics.  Prior to becoming an FBI Special Agent, I was a Special Agent with the United States Army Criminal Investigation Division (USACID), beginning in December 2014.  During my tenure with USACID, I applied and served as the affiant for numerous search warrants for individuals responsible for violent crimes.

8. Based on my training, knowledge, experience, and conversations with other law enforcement officers, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which drug traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

9. Based on my training and experience, my conversations with other agents, and my participation in this and other drug trafficking investigations, I know the following about the use of cell phones and other electronic devices by drug traffickers:

    a. Drug trafficking is an ongoing and recurring criminal activity.  As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

    b. Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, Short Message Service ("SMS"), Multimedia Messaging Service ("MMS"), electronic-mail ("e-mail"), cellular applications and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and drug traffickers.  In addition, drug traffickers will often change

their cell phones following the arrest of a member of their Drug Trafficking Organization or at random to evade law enforcement efforts. Drug traffickers frequently communicate on social media direct messaging and end-to-end encrypted applications ("apps") to avoid detection and monitoring by law enforcement. I know that although the messages sent over these apps may be encrypted, these messages can be read by examining the actual device that sent or received the message.

        c.      Members of criminal enterprises, including gangs and drug trafficking organizations, often carry and use cell phones. These individuals will use cell phones before, during, and after the commission of criminal activities, including violent acts, to communicate about their business, their disputes, or their intent to act against rivals.

        d.      I know, based on my training and experience, that drug traffickers commonly take or cause to be taken photographs and videos of themselves, their co-conspirators, drugs, proceeds, property, and/or assets; that these traffickers usually maintain these photographs and videos in their possession in their residences or on their cell phones.

        e.      Based on my training and experience, I know that drug traffickers often place cell phones, vehicles, residences, and other assets in names other than their own to avoid law enforcement surveillance or forfeiture and that, even though these items are in another entity or person's name, the drug traffickers actually own and continue to use these cellphones, vehicles, residences, and other assets.

## **PROBABLE CAUSE**

10. Since September 2022, the FBI Baltimore SSTF, in conjunction with the Baltimore Police Department (BPD), have been investigating a series of violent crimes that began around December 2021. Agents believe the violence stems from multiple drug trafficking organizations

(DTOs) feuding over claim of drug trafficking territory in and around the Cherry Hill neighborhood of Baltimore, Maryland.  The investigation to date has linked two homicides and 13 non-fatal shootings and firearm discharges to the ongoing feud between the targeted DTOs.  One of these non-fatal shootings that the FBI and BPD are investigating is the shooting of Wesley FULGHAM, A/K/A "Wes," A/K/A "Kev."

11. On October 10, 2020, BPD officers responded to a report of a shooting in the area of Curtis Avenue and Olmstead Street, Baltimore, MD 21226.  BPD officers located the victim, FULGHAM, in front of 4216 Curtis Avenue suffering from multiple gunshot wounds to his torso and hand.

12. During a canvas of the Curtis Avenue / Olmstead Street area, BPD officers located a related crime scene, at the intersection of Olmstead Street and Grace Court. At the scene, investigators located five .380 caliber shell casings, nine gel caps containing an unknown substance, which they suspected to be heroin, and 11 small containers, which I know to commonly be referred to as "trash cans" containing an unknown substance, appearing to be white in color with a rock-like structure, which officers suspected to be crack cocaine.

13. Based on my training, knowledge, and experience, heroin in Baltimore is typically packaged in gel caps similar to what BPD found at the scene.  Additionally, I know that crack cocaine is typically packaged in small containers called "trash cans" similar to what BPD officers found on-scene.  Additionally, the crack cocaine was visible through the packaging and appeared to be a white, rock-like substance, consistent with what officers know crack cocaine to be .

14. Crucially, BPD detectives identified a blood trail leading directly to FULGHAM's collapsed body and fresh blood smeared on a separate set of gel caps located within approximately ten feet of FULGHAM's wounded body.  These gel caps, which officers suspected to contain

heroin based on the packaging methods, as well as a few gel caps that were broken open and had a white powdery substance also consistent with heroin, were similar in appearance to the ones found at the intersection of Olmstead Street and Grace Court.  FULGHAM was the only individual in the area who law enforcement saw bleeding, leading detectives to believe the blood on the gel caps belonged to FULGHAM. Eight gel caps were collected from the location near FULGHAM's body.

15. Emergency medical services (EMS) transported FULGHAM to the hospital, where BPD shooting detectives interviewed him the next day, October 11, 2022.  During the interview on October 11, FULGHAM told BPD detectives he did not know or see who shot him.

16. I reviewed surveillance footage covering the time of the reported shooting.  An initial video showed an individual resembling the physical appearance of FULGHAM standing near the intersection of Olmstead Street and Grace Court with an unknown male (UM1). FULGHAM appeared to make a hand movement to another unknown male (UM2), who was wearing a reflective vest and construction helmet, to come over to their area.  UM2 chased UM1 and had him on the ground for about 20 seconds.  I believe this was a robbery taking place.  UM1 ran eastbound on Olmstead Street away from the interaction, and UM2 stood up and appeared to look at a plastic baggie and place it in his front pocket.

17. I also reviewed surveillance footage, approximately five minutes after the robbery. In this footage, a physical and verbal altercation occurs between two all-male groups near the intersection of Olmstead Street and Grace Court.  During the altercation, I observed a black male, who, based on his clothing, I believe to be UM1, start running southbound through the 4100 block of Grace Court.  He raises his arm holding what I believe to be a firearm, and appears to discharge it several times after he began to chase an individual matching the appearance of FULGHAM

eastbound on Olmstead Street towards Curtis Avenue. The video contains what I believe to be the sound of 6 rounds being fired from the firearm. The video then shows the suspected shooter returning back northbound through the back side of the residences on the 4100 block of Grace Court.



*Figure 1*

The above photograph depicts an orange arrow where the assailant ran southbound on Grace Court and a red circle indicating where the altercation began. The red arrow is the direction the assailant chased the victim, who I believe was FULGHAM, eastbound on Olmstead Street towards Curtis Avenue. The green arrow identifies the direction the assailant ran after the gunshots stopped. The yellow "X" marks where BPD officers located FULGHAM.

18. BPD investigators believe that FULGHAM is frequently in the areas of Cherry Hill, Brooklyn, and Curtis Bay, which are all within the Sothern District of Baltimore City. The location of the shooting, Curtis Avenue and Olmstead Street, is located in the Curtis Bay neighborhood. FULGHAM has a criminal history including the following crimes committed in the BPD Southern District:

a. On October 18, 2017, FULGHAM was arrested in the 3900 block of Pascal Avenue, located in the Curtis Bay neighborhood, for Controlled Dangerous Substances (CDS) possession with intent to distribute narcotics, conspiracy of CDS possession with intent to distribute, CDS possession of heroin, and conspiracy to distribute CDS with possession of heroin. The charges were marked Stet and not prosecuted.

b. In September 2018, FULGHAM was a shooting victim at 3700 block of South Hanover Street, located in the Brooklyn neighborhood. Based on my knowledge of the area and conversation with other law enforcement officers, I believe that the 3700 block of South Hanover Street is a known open air drug market, which I know has a history of drug related violence.

c. On July 31, 2019, BPD arrested FULGHAM in the 5500 block of Pennington Avenue, located in the Curtis Bay neighborhood, for distribution/possession with intent to distribute heroin/fentanyl mixture and possession with intent to distribute narcotics. Law enforcement suspected the narcotics to be distributed were marijuana and a heroin/fentanyl mixture. FULGHAM entered a guilty plea to one charge and was sentenced to two years confinement.



*Figure 2*

*The above figure captures areas of BPD Southern District including Cherry Hill, Brooklyn, and Curtis Bay.  The addresses noted from paragraphs 14 a and b, are listed on Figure 2 for area reference.*

19.     The SUBJECT DEVICE is currently in the lawful possession of the FBI at the Baltimore, Maryland field office and has been since October 20, 2022.

20.     Upon FULGHAM's arrival at the hospital, hospital personnel took the following items from FULGHAM's person:  $389.86 in U.S. currency, various clothing items, and the SUBJECT DEVICE.  Hospital medical staff obtained the SUBJECT DEVICE's password to turn the phone off. It is common for hospital staff to collect all patient personal items, document the belongings on a log, and law enforcement will later collect the items from hospital staff if necessary for an investigation.

21. These items were later taken by BPD and entered into evidence by the BPD Evidence Control Unit.

22. On October 20, 2022, FBI investigators collected the phone from the BPD Evidence Control Unit and retained the item in the custody of the FBI in Baltimore, Maryland.

23. Based on my training, experience, and knowledge of this investigation, I believe that the SUBJECT DEVICE likely contains evidence of a conspiracy to distribute controlled substances, including communications with known and unknown co-conspirators, photographs of narcotics, location data associating FULGHAM's drug trafficking activity with potential narcotics suppliers, customers, stash locations, and conversations regarding area control and competitors. Additionally, I believe there may be evidence identifying the suspect and/or organization responsible for the attempted murder of FULGHAM on October 10, 2022. The evidence is likely to have remained on the SUBJECT DEVICE because FULGHAM promptly went into surgery at the hospital and was unable to access the SUBJECT DEVICE to remove information before it was taken into law enforcement custody.

## TECHNICAL TERMS

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos

   c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the

ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

    d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can

work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

25. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night

## CONCLUSION

30. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the SUBJECT DEVICE described in Attachment A to seek the items described in Attachment B.

31. I respectfully request that this Court issue a search warrant for the SUBJECT DEVICE, as described in Attachment A, for the purpose of seizing the items particularly described in Attachment B.

Respectfully submitted,

_____
Sarah M. Griffiths
Special Agent, Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. P. 4.1 and 41(d)(3) on November __10th__, 2022.

_____
Hon. Matthew J. Maddox
United States Magistrate Judge